| | |
|---|---|
| 1 | MICHAEL A. SHERMAN (SBN 94783) |
|   | masherman@stubbsalderton.com |
| 2 | JEFFREY F. GERSH (SBN 87124) |
|   | jgersh@stubbsalderton.com |
| 3 | SANDEEP SETH (SBN 195914) |
|   | sseth@stubbsalderton.com |
| 4 | WESLEY W. MONROE (SBN 149211) |
|   | wmonroe@stubbsalderton.com |
| 5 | STANLEY H. THOMPSON, JR. (SBN 198825) |
|   | sthompson@stubbsalderton.com |
| 6 | VIVIANA BOERO HEDRICK (SBN 239359) |
|   | vhedrick@stubbsalderton.com |
| 7 | **STUBBS, ALDERTON & MARKILES, LLP** |
|   | 15260 Ventura Blvd., 20th Floor |
| 8 | Sherman Oaks, CA 91403 |
|   | Telephone:   (818) 444-4500 |
| 9 | Facsimile:    (818) 444-4520 |

**Attorneys for PersonalWeb Technologies, LLC**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE PERSONAL WEB TECHNOLOGIES, LLC, ET AL., PATENT LITIGATION | **CASE NO.: 5:18-md-02834-BLF** |
| AMAZON.COM, INC. and AMAZON WEB SERVICES, INC., | **CASE NO.: 5:18-cv-00767-BLF** |
|     Plaintiffs, | **CASE NO.: 5:18-cv-05619-BLF** |
| v. | **DECLARATION OF KEVIN BERMEISTER IN SUPPORT OF PERSONALWEB TECHNOLOGIES, LLC'S OPPOSITION TO MOTION OF AMAZON.COM, INC., AMAZON WEB SERVICES, INC., AND TWITCH INTERACTIVE, INC. FOR ATTORNEY FEES AND COSTS** |
| PERSONALWEB TECHNOLOGIES, LLC, and LEVEL 3 COMMUNICATIONS, LLC, | |
|     Defendants. | |
| PERSONALWEB TECHNOLOGIES, LLC and LEVEL 3 COMMUNICATIONS, LLC, | Date:    August 6, 2020 |
|     Counterclaimants, | Time:    9:00 a.m. |
| v. | Dept.:    Courtroom 3, 5th Floor |
| AMAZON.COM, INC. and AMAZON WEB SERVICES, INC., | Judge:    Hon. Beth Labson Freeman |
|     Counterdefendants. | |

| | |
|---|---|
| 1 | PERSONALWEB TECHNOLOGIES, LLC, a Texas limited liability company, and LEVEL 3 COMMUNICATIONS, LLC, a Delaware limited liability company |
| 2 | |
| 3 | |
| 4 | Plaintiffs, |
| 5 | v. |
| 6 | TWITCH INTERACTIVE, INC. a Delaware corporation, |
| 7 | Defendant. |

I, Kevin Bermeister, declare as follows:

1. I reside in Sydney, Australia. I have personal knowledge of the matters set forth below and if called as a witness I would and could competently testify thereto. I am the Non-Executive Chairman of PersonalWeb Technologies, LLC ("PersonalWeb") and have held that position at all times material to this declaration.

2. In an earlier declaration I provided in the within action dated March 23, 2018 (Dkt. 37-1), I set forth background information on the approximate fifteen years of licensing activity associated with the "True Name" patent family, the acquisition by PersonalWeb of the "True Name" family of patents in 2011, my involvement with various companies that have attempted to commercially exploit the True Name technology over many years (including specifically PersonalWeb's business in developing the product it named Study Pods®, a natural language processing product designed for academic use, during the time period 2011-2016).  In another declaration I provided in the within action, dated January 9, 2019 (Dkt. 335), I set forth information on the business objectives PersonalWeb was pursuing in connection with the Texas Action, my personal understanding of the specific technology that was (and was not) the subject of that earlier action, and the events leading to the dismissal of that action.

3. In Amazon's Motion it states, concerning the Texas Action, that "PersonalWeb had no valid claim in that case: it had no choice but to dismiss its complaint with prejudice after claim construction." (Motion, 1:26-27).  That assertion is completely false.  PersonalWeb's decision to dismiss that Texas Action was in no way motivated or driven by any so-called unfavorable or adverse claim construction by the court in the Texas Action—indeed, to the contrary, myself and PersonalWeb's entire team viewed claim construction in the Texas Action as a victory, as the vast majority of the claim constructions made in that case were precisely the ones PersonalWeb had been advocating, and the ones that PersonalWeb did not achieve constructions it was seeking were not believed to be case dispositive in any way.

4. In the time leading up to PersonalWeb and Amazon reaching agreement in June 2014 for dismissal of the case, inquiry had been made of PersonalWeb's lead patent counsel in the Texas Action, senior partner and preeminent, nationally-regarded patent litigator Roderick Dorman of

McKool Smith, regarding the possible preclusive effect of a dismissal with prejudice on PersonalWeb's ability to assert future claims against Amazon. In response to this inquiry, Mr. Dorman provided me with an e-mail I regarded as his written opinion dated May 22, 2014 that "any act of infringement occurring after the filing of complaint is not precluded by *res judicata* and can be asserted in a later proceeding." A true and correct copy of Mr. Dorman's e-mail to me is attached as Exhibit 1. But for Mr. Dorman's untimely death last month, I anticipated Mr. Dorman providing a declaration of his own attesting to this opinion, one that I relied on. In addition to my relying on that written legal opinion in agreeing with the dismissal of the Texas Action, I also relied on an additional written legal opinion issued in connection with the decisions that were made on behalf of PersonalWeb in early January 2018 to file the initial complaints that comprise this multi-district litigation. Similarly, as described with greater detail in Mr. Sherman's declaration filed concurrently, PersonalWeb's legal team again analyzed the preclusive effect of the Texas Action in December 2017 and early 2018. At that time, I was then aware that a legal memo had been prepared that concluded that PersonalWeb had good faith, reasonable arguments that the impending lawsuits to be filed concerning cache control operations' infringement of claims of the True Name patents would not be precluded as a result of the outcome of the Texas Action, and I relied on those legal opinions for the same purposes.

5. Beginning in late 2016, as a result of my ongoing involvement in the True Name patents and my own technical curiosity, supported by conversations I had been having on a recurrent basis with Dr. Brian Siritzky (a Phd expert in distributive computing and the internet, as well as the attorney who wrote the True Name patents), computer engineers, persons I knew to be experts in the field of distributive computing and the internet with whom I had professional relationships, reviews of diverse technical literature, and reading/re-reading the True Name patents, I formed opinions that (1) there might be a correlation between the operation of the Ruby on Rails development program ("RoR") and/or the Amazon S3 product, and the generation of content based ETags used for purposes of cache control, and (2) the generation and use of these ETags utilizing HTTP might constitute acts of patent infringement of the True Name patents. Also in late 2016, I started to investigate and work on a list of website operators I believed might be infringing cache control-

2

related claims of the True Name patents by, among other things, obtaining information on the operation of a particular website operator's webpage from the Wayback machine, through the use of historical archiving. The efforts I describe above were efforts that I persisted at, through 2017 in parallel with advice and direction I sought from legal counsel.

6. Beginning not later than early to mid-spring, 2017, I started having frequent, technical conversations with Dr. Siritzky joined by attorney Sandeep Seth about PersonalWeb's emerging infringement theory. I knew Mr. Seth to be an attorney who I had previously worked with when he was Of Counsel at Susman Godfrey on the PersonalWeb/Microsoft case in the time period 2012-2014. I had supplemented Dr. Siritzky's guidance with Mr. Seth, then, to provide PersonalWeb with legal counsel and expert technical advice (along with Dr. Siritzky) on potential patent infringement claims and to ensure that the theory of patent infringement was understood, was being practiced, and could be proved.

7. Also at that time, I began to spend more time on the list of potential infringers, *i.e.*, the hypothesis I had reached that website operators that developed their website utilizing the RoR developers kit and/or were using Amazon's S3 to serve their webpage assets to browsers were infringing the True Name patents. I oversaw work on that list of potential infringers as that list was further developed and curated in the March 2017 time period all the way through filing of the initial complaints in this MDL on January 8, 2018, and beyond. Without my having specifically counted the number of website operators on that list, I know that it numbered in the hundreds, by late 2017.

8. Regarding the list of potential infringers, this list did not contain every single website on the internet—or anything even close to that, or even in the same range, nor did it include websites that were performing only required HTTP functions; rather, this list contained only those websites that were believed to infringe the True Name patents after the preliminary conclusion that those websites were utilizing S3 with content based Etags or had been developed using RoR. I knew then, and know now, that there were an enormous number of websites that used S3 with ETags other than content based ETags, or did not use ETags, or did not use S3 and were not developed using RoR. Those website operators were never considered by me as potentially being included within the potential universe of infringers. As such, over the period of my participation in pre-filing work on

identifying potential infringers, the number of website operators on the list changed as more information was developed about whether and how a website was using RoR or S3, and whether a site experienced material U.S. traffic. Over that period, a material number of sites were found to not meet those criteria, and dropped or not included in the list I compiled.

9. In the spring of 2017, as I was obtaining increasing amounts of information from Dr. Siritzky and Mr. Seth about different aspects of the infringement theory as well as accused activities of website operators, and also developing that list of potential infringers, I became aware of, and consulted on and approved, the retention of PersonalWeb's legal counsel (and technical experts the company was then hiring) to carefully review all prior constructions of the True Name patents, and to compare each of the accused websites to the infringement read of the True Name patent claims that were potentially applicable, in order to develop infringement reads.

10. As part of the pre-suit investigation from spring 2017 through early January 2018, PersonalWeb spent over six hundred thousand dollars for professional fees and costs, in the diligence I describe generally herein, aspects of which are described in greater detail in the other accompanying declarations. I estimate I personally expended in excess of 300 hours during the time period of late 2016, 2017, through early 2018 engaged in technical investigation and consulting with those that PersonalWeb hired to assist in the process, about how cache control processes work and studying infringement of the True Name patents by suspected infringing website operators.

11. Separate and apart from PersonalWeb's original business in developing Study Pods®, PersonalWeb and its predecessors have licensed the True Name patents extensively to some of the largest companies in the world, on market terms. Prior to its acquisition of the patent family in 2011, the True Name patents had been licensed by Kinetech in 15 licenses, including some exclusive licenses within particular fields of use, indicating the licensee's ability to use the patents offensively themselves. Kinetech's licensees included Skype, Iron Mountain, Connected Corporation, Level 3 Communications, and Centergate Research Group. None of these licenses resulted from litigation. PersonalWeb had similar success in licensing the True Name patents. PersonalWeb has entered settlement and license agreements with, among others, Microsoft, IBM, Hewett Packard, Autonomy, NEC, and Yahoo. None of these were "nuisance" value agreements. Rather, they included market-

based license payments, with many licenses coming after licensee-invoked IPR proceedings clearly demonstrated that licensees perceived the value of the patents after losing at the IPR stage.

12. The True Name patents have never been licensed on "nuisance" or "cost of defense" financial terms. While Amazon asserted in its motion that PersonalWeb pursued these proceedings to "extract" or obtain such types of quick settlements, that is incorrect—PersonalWeb did not engage in these activities I testified to above and expend the enormous sums of money it spent, ever with the objective of ever engaging in such conduct. And PersonalWeb did not engage in such conduct, either pre-filing or post-filing, as is evidenced by instances where PersonalWeb refused to engage with defendants who entreated it to consider below-market settlements. To the contrary, PersonalWeb filed these actions and pursued this MDL to protect its valuable intellectual property rights.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on June 19, 2020 in Sydney, Australia.

/s/ Kevin Bermeister