1  J. DAVID HADDEN (CSB No. 176148)
   dhadden@fenwick.com
2  SAINA S. SHAMILOV (CSB No. 215636)
   sshamilov@fenwick.com
3  MELANIE L. MAYER (admitted *pro hac vice*)
   mmayer@fenwick.com
4  TODD R. GREGORIAN (CSB No. 236096)
   tgregorian@fenwick.com
5  RAVI R. RANGANATH (CSB No. 272981)
   rranganath@fenwick.com
6  CHIEH TUNG (CSB No. 318963)
   ctung@fenwick.com
7  TJ FOX (CSB No. 322938)
   tfox@fenwick.com
8  FENWICK & WEST LLP
   Silicon Valley Center
9  801 California Street
   Mountain View, CA  94041
10 Telephone:    650.988.8500
   Facsimile:    650.938.5200

Counsel for AMAZON.COM, INC.,
AMAZON WEB SERVICES, INC., and
TWITCH INTERACTIVE, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| IN RE: PERSONAL WEB TECHNOLOGIES, LLC ET AL., PATENT LITIGATION | Case No.: 5:18-md-02834-BLF |
| AMAZON.COM, INC., and AMAZON WEB SERVICES, INC., <br><br>Plaintiffs<br>v.<br><br>PERSONALWEB TECHNOLOGIES, LLC and LEVEL 3 COMMUNICATIONS, LLC,<br><br>Defendants, | Case No.: 5:18-cv-00767-BLF <br><br> Case No.: 5:18-cv-05619-BLF <br><br> **REPLY OF AMAZON.COM, INC., AMAZON WEB SERVICES, INC., AND TWITCH INTERACTIVE, INC. IN SUPPORT OF MOTION FOR ATTORNEY FEES AND COSTS** |
| PERSONALWEB TECHNOLOGIES, LLC, and LEVEL 3 COMMUNICATIONS, LLC,<br><br>Plaintiffs,<br>v.<br><br>TWITCH INTERACTIVE, INC.,<br><br>Defendant. | Date: August 6, 2020<br>Time: 9:00 a.m.<br>Dept: Courtroom 3, 5th Floor<br>Judge: Hon. Beth L. Freeman<br><br>**PUBLIC REDACTED VERSION OF DOCUMENT SOUGHT TO BE SEALED** |

**TABLE OF CONTENTS**

I. INTRODUCTION ........................................................................................................... 1

II. PERSONALWEB'S PURPORTED PRE-FILING INVESTIGATION IGNORED OBVIOUS AND FATAL DEFECTS. ............................................................................. 1

    A. The patents do not cover the basic web functions PersonalWeb accused. .................................................................................................................. 2

    B. Claim preclusion plainly barred PersonalWeb's claims against Amazon customers arising before the judgment in the Texas case. ....................... 4

III. PERSONALWEB LITIGATED THIS CASE UNREASONABLY. ................................ 6

    A. PersonalWeb changed its infringement positions at every turn. ............................ 6

    B. PersonalWeb took frivolous claim construction positions and later flouted the Court's adverse constructions. ............................................................. 8

        1. PersonalWeb sought belated leave to amend its infringement contentions further after the Court rejected its arguments regarding the "authorization" terms. ................................................................................ 9

        2. Rather than dismiss its claims following claim construction, PersonalWeb told its expert to ignore the Court's constructions altogether. ................................................................................................... 9

        3. PersonalWeb sought reconsideration without leave by moving to "clarify" constructions that were clear and unambiguous. .......................... 9

IV. THE COURT SHOULD NEITHER CONSIDER NOR CREDIT PERSONALWEB'S OPINIONS OF COUNSEL. ............................................................ 9

V. PERSONALWEB'S STRATEGY WAS CALCULATED SOLELY TO SECURE NUISANCE SETTLEMENTS RATHER THAN TEST THE MERITS OF ITS CLAIMS. .......................................................................................................................... 11

VI. PERSONALWEB WAIVED ANY CHALLENGE TO THE REASONABLENESS OF THE REQUESTED FEES AND COSTS. ............................. 13

VII. CONCLUSION .............................................................................................................. 15

# TABLE OF AUTHORITIES

*Cases:*                                                                                                          *Page(s):*

*Bd. of Trs. of Laborers Health and Welfare Trust Fund for N. Cal. v. RMT Landscape Contractors, Inc.*,
   No. 4:19-cv-01771-KAW, 2020 WL 978622 (N.D. Cal. Feb. 28, 2020) ........................... 14

*Brain Life, LLC v. Elekta Inc.*,
   746 F.3d 1045 (Fed. Cir. 2014) ........................................................................................... 6

*Chevron Corp. v. Pennzoil Co.*,
   974 F.2d 1156 (9th Cir. 1992) ........................................................................................... 10

*Earthquake Sound Corp. v. Bumper Indus.*,
   352 F.3d 1210 (9th Cir. 2003) ........................................................................................... 13

*Garcia v. Resurgent Capital Servs., L.P.*,
   No. C-11-1253 EMC, 2012 WL 3778852 (N.D. Cal. Aug. 30, 2012) ............................... 14

*Gilead Scis., Inc. v. Merck & Co., Inc.*,
   No. 5:13-cv-04057-BLF, 2016 WL 4242216 (N.D. Cal. Aug. 11, 2016) .......................... 14

*Gilead v. Merck*,
   No. 5:13-cv-04057-BLF, Dkt. 444 (N.D. Cal. Jul. 19, 2016) ....................................... 14, 15

*Goodell v. Ralphs Grocery Co.*,
   207 F. Supp. 2d 1124 (E.D. Cal. 2002), *abrogated on other grounds by Hubbard v. Sobreck, LLC*, 554 F.3d 742 (9th Cir. 2009) ..................................................... 14

*Hernandez v. Tanninen*,
   604 F.3d 1095 (9th Cir. 2010) ........................................................................................... 10

*In re PersonalWeb Techs. LLC*,
   961 F.3d 1365 (Fed. Cir. 2020) ........................................................................................ 2, 5

*In re PersonalWeb Techs. LLC Pat. Litig.*,
   No. 18-md-2834, 2019 WL 1455332 (N.D. Cal. Mar. 13, 2019) ........................................ 5

*Nye v. Sage Prods., Inc.*,
   98 F.R.D. 452 (N.D. Ill. 1982) .......................................................................................... 10

*SpeedTrack, Inc. v. Office Depot, Inc.*,
   791 F.3d 1317 (Fed. Cir. 2015) ........................................................................................... 5

*ThermoLife Int'l LLC v. GNC Corp.*,
   922 F.3d 1347 (Fed. Cir. 2019) .................................................................................... 11, 13

*ThermoLife Int'l, LLC v. Myogenix Corp.*,
   No. 13cv651 JLS (MDD), 2017 WL 1235766 (S.D. Cal. Apr. 4, 2017) ............... 10, 11, 13

***Other Authorities:***

Fed. R. Civ. P. 11 ...................................................................................................................6

Fed. R. Civ. P. 54 .................................................................................................................13

FENWICK & WEST LLP
ATTORNEYS AT LAW

AMAZON AND TWITCH REPLY RE MOTION FOR ATTORNEY FEES

iii

CASE NOS. 5:18-md-02834-BLF,
5:18-cv-00767-BLF, and
5:18-cv-05619-BLF

## I. INTRODUCTION

This case was never about the underlying merits. It was always about the *in terrorem* effect of suing nearly a hundred customers (including medium-sized businesses) of a single company, and leveraging customer fear of being forced to pay millions to defend someone else's technology into a lucrative settlement. That tactic is as cynical as it is corrosive to our institutions. It squanders scarce judicial resources from more deserving claimants who daily petition our courts for redress of real injuries. It diverts otherwise useful capital away from innovation and job creation and towards dead-weight windfalls for the undeserving. And it has brought worldwide opprobrium onto our nation's patent system. Amazon could and did defend this case on behalf of its customers, but the unfortunate fact is that many targets of patent abuse do not because they cannot. For every case that has reached this point—where a defendant has the will and the wherewithal to see a case through—there are hundreds, even thousands, that never benefit from the disinfecting sunlight of a final judgment.

Here, we have three such final judgments. And each shows just how frivolous this case has always been. None of PersonalWeb's hundreds of pages of post-hoc, cherry-picked, self-serving and (formerly) privileged declarations and exhibits justifies the cascade of increasingly frivolous positions that PersonalWeb actually advanced in this case. Amazon respectfully urges the Court to seize this unique opportunity to remind all litigants that invoking the coercive power and careful attention of our courts is more than a right. It is also a great privilege—one of the very blessings of liberty—and may not be cynically abused without meaningful consequence.

## II. PERSONALWEB'S PURPORTED PRE-FILING INVESTIGATION IGNORED OBVIOUS AND FATAL DEFECTS.

PersonalWeb spends nearly half of its opposition describing the "multiple prefiling legal opinions" that it commissioned before filing. (Opp. at 2-13; Dkt. 608-1 ("Bermeister Decl.") ¶ 10; Dkt. 608-16 ("Sherman Decl.") ¶ 5.) Setting aside that those opinions were prepared by people having a financial interest in the outcome of this litigation, those opinions hardly show that PersonalWeb reasonably believed in seeing this case through on the merits.

FENWICK & WEST LLP
ATTORNEYS AT LAW

AMAZON AND TWITCH REPLY RE MOTION FOR
ATTORNEY FEES

1

CASE NOS. 5:18-md-02834-BLF,
5:18-cv-00767-BLF, and
5:18-cv-05619-BLF

### A. The patents do not cover the basic web functions PersonalWeb accused.

PersonalWeb knew from the start that one of the key requirements of every asserted claim is *permitting/allowing* or *not permitting/allowing* access to content depending on whether the requested content is authorized or licensed. (*See, e.g.*, '310 patent, cl. 20 ("permitting the content to be provided or accessed by the at least one other computer if it is not determined that the content is unauthorized or unlicensed"); '420 patent, cl. 25 ("selectively allowing [content] . . . to be provided to or accessed by or from at least one of the computers"), cl. 166 ("selectively permit the particular data item to be made available for access and to be provided to or accessed by"); '442 patent, cl. 11 ("allowing the file to be provided from one of the computers having a licensed copy of the file").) But to satisfy these claim elements, PersonalWeb accused a basic and ubiquitous feature of the standard and publicly available HTTP protocol: conditional GET requests. *In re PersonalWeb Techs. LLC*, 961 F.3d 1365, 1370 & n.1 (Fed. Cir. 2020) (noting PersonalWeb's allegations against Amazon's S3 targeted "Hyper Text Transfer Protocol ('HTTP') 'GET' request[s]," and "HTTP is a standard communication protocol that web browsers and web servers follow in order to communicate with each other on the Internet."); (Dkt. 578 (Second MSJ Order) at 7-8; Dkt. 540-6 (Weissman Report) ¶¶ 26, 94; Dkt. 543-1 (de la Iglesia Report) ¶¶ 18-47, 86-180, 194.)

Even a cursory review of the HTTP specification would have revealed that it has no notion of permitting (or not permitting) access to content. The HTTP protocol assumes that all content can be accessed anonymously by any browser asking for it. Nor does the HTTP protocol deny a browser access to stale content that it already has in its cache. To the contrary, the HTTP protocol *requires* the web browser to display expired content when a user requests to see the browser history or uses the browser's "back" button. (Second MSJ Order at 16; *see also id.* at 18 ("As the parties agree, the browser continues to have access to the stale cached file via the browser's 'history' and 'back' functions.").). The hundreds of hours PersonalWeb spent confirming the server configurations of each Amazon customer and pasting different customer names into claim charts are irrelevant, as it was always obvious that the patents had nothing to do with the web functions PersonalWeb was "investigating."

This fundamental difference between PersonalWeb's patents and the HTTP protocol is one

of the reasons why the Court granted Amazon summary judgment of non-infringement. (Second MSJ Order at 18-19.) This was not a close case, in the Court's own words: "There is *simply no evidence of not permitting/not allowing of any kind* by the accused products." (*Id.* at 18 (emphasis added).) The Court arrived at this part of its holding merely by comparing the plain language of the claims with the HTTP specification—no claim construction was required. PersonalWeb could and should have done this same comparison before filing these cases. (*See id.*) And perhaps it did and proceeded anyway. Either way, the consequences for this motion are the same.

PersonalWeb argues that its "reading of 'permitting/not permitting' claim elements was reasonable because (a) the max-age value received in the original HTTP 200 response set an original time that the content was permitted to be used; and (b) the 304 response gave new permission to use the content for the amount of time set by the max-age value." (Opp. at 6.) This is a rehash of the same frivolous argument PersonalWeb made in opposing summary judgment: "freshness" of an asset file has nothing to do with whether a browser is "permitted" access to that file. (Second MSJ Order at 18 ("the server's response to a conditional GET request is 'a version control mechanism' and does not 'not permit' the browser from continuing to use the version it already has").)

PersonalWeb's other infringement allegations were no better. For example, claims 25 and 166 of the '420 patent require comparison of a content-dependent name—as accused by PersonalWeb, the ETags generated by Amazon's CloudFront—to a *plurality* of identifiers/data items. (*See* Second MSJ Order at 22.) It was *undisputed* that, following the HTTP protocol, CloudFront performed a *one-to-one* comparison of the ETag for the data item in the browser's cache with the version of the file stored on the server. (*Id.* at 22-23) Whether or not it is fair to charge PersonalWeb with knowledge of this fact before this case was filed, it was inexcusable for PersonalWeb to proceed with these claims afterwards by asking the Court to read the word "plurality" out of the patent. (*Id.* at 23.) As the Court put it, PersonalWeb was simply asking the Court to "make rookie mistakes" that would "be reversed" and "fast." (Dkt. 573 (Nov. 14, 2019 Hrg. Tr.) at 91:8-12; Second MSJ Order at 23.)

PersonalWeb's indignation at the suggestion that it accused basic web functionality rings especially hollow. (Opp. at 4.) It argues that it has not "accused the entire web of infringing its

patents" based solely on the fact that it did not *literally* sue all (as opposed to merely 85) web-based businesses that use the same basic technology. (*See id.*) That rhetorical point aside, suing the web *was* in fact PersonalWeb's aspiration: ███████████████████████████ testified PersonalWeb executive Kevin Bermeister. (Gregorian Decl., Ex. 1 (Bermeister Dep. Tr.) at 205:9-23.) PersonalWeb did not conceal this strategy during the case: Its technical expert described the patents as "relat[ing] to ubiquitous and universally practiced web protocols and standards such as HTTP." (de la Iglesia Report at ¶ 194.) Indeed, PersonalWeb's own description of its infringement theory prompted the Court to ask whether PersonalWeb would "go after every website in the universe." (Nov. 14, 2019 Hrg. Tr. at 52:8-20.) PersonalWeb's response—which it criticizes Amazon for omitting in the motion—was hardly reassuring, stating that PersonalWeb accused "specific aspects of HTTP, basically responding to conditional GETs with 304 and 200 messages." (*Id.* at 53:7-9; *see also id.* at 55:13-17.) But these are basic HTTP operations in widespread use. And while some (long expired) patent theoretically *could* cover them, PersonalWeb's patents do not. Any reasonable pre-filing investigation would have revealed this basic fact. Instead of doing this investigation, however, as evidenced by its countless pages of supporting declarations and documents, PersonalWeb merely cataloged the specific ways myriad different websites use the same non-infringing HTTP operations, with no confirmation that those operations actually map to its claims—which is why, when pressed, PersonalWeb could muster "simply no evidence" in support of its infringement claims. (Second MSJ Order at 18.)

**B.   Claim preclusion plainly barred PersonalWeb's claims against Amazon customers arising before the judgment in the Texas case.**

PersonalWeb admits that when it decided to sue 85 Amazon customers, despite having already lost against Amazon, it "[r]ecogniz[ed] the possibility of a defendant raising preclusion in defense" to those claims. (Opp. at 4.) PersonalWeb haled 85 companies into court despite these concerns and carried on the litigation until its claims were barred a second time by a second judgement. PersonalWeb's focus on the purported uncertainty as to the application of the *Kessler* doctrine is a distraction; when it decided to pursue its claims, there was *no* ambiguity with respect to claim preclusion law, which barred all of its claims for alleged infringement occurring prior to the

judgment in the Texas case.

PersonalWeb's arguments against the straightforward application of claim preclusion were frivolous. First, it argued that because the Texas case involved only the multipart upload feature of S3, it was free to accuse a different feature of S3. *Id.* at 1375. To support this argument, PersonalWeb submitted a declaration from its counsel Mr. Hadley stating that the Texas case involved only the multipart upload feature of S3 and not the conditional GET requests at issue in this case. (Dkt. 337.) That argument was both factually and legally wrong. Indeed, the Court rejected the declaration of Mr. Hadley as "troubling," "self-serving," and "contrary to the evidence from his own case," including PersonalWeb's infringement contentions and discovery requests, both identifying conditional GET requests as accused in the Texas case. *In re PersonalWeb Techs. LLC Pat. Litig.*, No. 18-md-2834, 2019 WL 1455332, at *11 (N.D. Cal. Mar. 13, 2019) ("the evidence shows that the discovery and infringement contentions in the Texas Action . . . also encompassed the HTTP GET (download) command [and] [n]o reasonable jury could conclude otherwise"); (Dkt 394 (First MSJ Order) at 18:12-13; Dkt. 376 at 53:19-22.) The Court also noted that "nothing in the relevant Federal Circuit precedent" supported PersonalWeb's argument that it could accuse different features of the same product in successive cases. *PersonalWeb*, 2019 WL 1455332, at *13. The Federal Circuit agreed, finding PersonalWeb's argument that it had not accused conditional GET requests in the Texas case to be "at odds with the representations PersonalWeb made in the Texas case" and confirming that PersonalWeb could not circumvent claim preclusion by asserting "different legal theories" or "emphasiz[ing] different facts" in subsequent cases. *PersonalWeb*, 961 F.3d at 1376.

Second, PersonalWeb argued before this Court (an argument it dropped on appeal) that even if claim preclusion applied, it would preclude claims based only on conduct *before the date of the complaint filing* in the Texas action. (*See* Bermeister Decl. ¶ 4.) PersonalWeb purportedly relied on the opinion of its then-counsel Roderick Dorman that "any act of infringement occurring after the filing of the complaint is not precluded by *res judicata* and can be asserted in a later proceeding." (*Id.*; Dkt. 608-2 (May 22, 2014 Email from Dorman).) If PersonalWeb indeed relied on this single 2014 email from its former lawyer—the same lawyer who lost in the Federal Circuit in

*SpeedTrack, Inc. v. Office Depot, Inc.*, 791 F.3d 1317 (Fed. Cir. 2015)—in deciding to sue 85 Amazon customers four years later, that reliance was undoubtedly unreasonable because the law is clear that claim preclusion bars claims arising through *final judgment* in the first lawsuit. *Brain Life, LLC v. Elekta Inc.*, 746 F.3d 1045, 1053 (Fed. Cir. 2014) ("principles [of claim preclusion] bar the assertion of infringement of either the method or system claims to the extent the alleged acts of infringement *predate the final judgment* in the [first] MIDCO Litigation") (emphasis added). Relying on bad law is not an excuse for an unreasonable litigation campaign. If PersonalWeb and its counsel were diligent, as they were required to be under Rule 11, they would have known that their claims could not succeed. For example, in its amended complaint against Twitch, PersonalWeb attached an exhibit purportedly "list[ing] specific examples of files that were . . . served by or on behalf of Defendant during the relevant time period." (Case No. 18-cv-05619, Dkt. 13 at ¶ 51.) In that exhibit, PersonalWeb alleged that Twitch served webpage files using the accused HTTP operations as of May 2014, *before* the Texas final judgment was entered in June 2014. (*Id.*, Dkt. 13-1.) Thus, even if PersonalWeb *could* show that Twitch met the asserted claims (and it could not)—the only "evidence" PersonalWeb had of alleged infringement by Twitch related to acts that occurred *prior* to the judgment in the Texas case, when PersonalWeb's claims were barred by claim preclusion.

## III.  PERSONALWEB LITIGATED THIS CASE UNREASONABLY.

The way PersonalWeb litigated this case after filing—including its constantly shifting infringement positions—independently supports an exceptional case determination.

### A.  PersonalWeb changed its infringement positions at every turn.

PersonalWeb contends that "[f]rom the day PersonalWeb filed its first case, its 'infringement theory' was and remained the same." (Opp. at 7.) That is true in a sense: PersonalWeb always accused the same basic features of the HTTP protocol. But, in an attempt to bob-and-weave in response to every adverse ruling or opposition brief, PersonalWeb constantly shifted positions solely to keep the plates spinning in the hope of coercing a settlement.

PersonalWeb's inconsistent representations to the JPML and this Court provide just one of

many examples of its say-anything approach.  When PersonalWeb sought centralization of its customer suits as an MDL—so it could litigate the customer cases simultaneously and maximize its settlement leverage—it "argued [to the JPML] that it had accused the website operators of infringing *through their use of Amazon's S3*."  (Opp. at 11 (emphasis added); Dkt. 592-14 (MDL Motion) at 7 ("Each defendant is alleged to have contracted with the same third party to serve its content on its behalf using the same S3 host system so that it may control its content distribution in an infringement of the Patents-in-Suit.").)  Later, recognizing that its admission regarding S3's role would make it impossible to avoid a stay or injunction under the customer suit doctrine, PersonalWeb told *this* Court, in unmistakably clear language, that its "infringement theory" was *not* based on S3:

> But I think, importantly, the Amazon DJ Action will not resolve claims against the individual defendants because *PersonalWeb's theory of infringement revolves around Ruby on Rails not S3*, it is the Ruby on Rail website owner that controls and drives the use of ETags.

(Case No. 5:18-cv-00767-BLF (DJ Action), Dkt. 54 at 43:24-44:3 (emphasis added).)  PersonalWeb contends that its representations to this Court and the JPML were consistent because it *also* identified Ruby on Rails to the JPML *in addition to* S3.  (Opp. at 10-11.)  But that is beside the point:  PersonalWeb expressly relied on each defendant's use of S3 as a common fact issue that would make centralization appropriate, and then told this Court its theory was based on "Ruby on Rails not S3."  (DJ Action, Dkt. 54 at 44:1-2.)  The Court ultimately saw through this tactic, noting that PersonalWeb had not "map[ped] [Ruby on Rails] to the claimed elements at all."  (*Id.* at 11:6-8.)  Naturally, PersonalWeb would then go on to ignore Ruby on Rails for the remainder of the case, it's potential rhetorical utility having been exhausted:  Mr. de la Iglesia offered no infringement opinion based on Ruby on Rails, and PersonalWeb did not so much as mention it in opposition to Amazon and Twitch's summary judgment motions.  (*See generally* de la Iglesia Report; Dkt. 550 (Resp. to Amazon MSJ); Dkt. 551 (Resp. to Twitch MSJ).)

After the Court stayed the customer cases, PersonalWeb subdivided its cases into *four* "categories," only one of which, according to PersonalWeb, was based on S3.  (*See* Dkt. 96.)  PersonalWeb still contended that its "infringement theory" never changed and that its discussion of four

categories was meant only "[t]o illuminate the differences between the Court-permitted amendments that would be made to website operator complaints in October 2018." (Opp. at 10.) This is revisionist: the "categories" were meant to convince the Court that not all customer cases are the same and entice it to allow the customer cases to move forward in parallel with Amazon's declaratory judgment action to add expense and better coerce settlements. (*See* Dkt. 96 at 28-29 (declining to identify a representative customer case and requesting that all customer defendants participate in the case through the *Markman* hearing).)

### B. PersonalWeb took frivolous claim construction positions and later flouted the Court's adverse constructions.

PersonalWeb's litigation strategy with respect to the "authorization" terms further supports a finding of exceptionality. In an unrelated prior case in the Eastern District of Texas, Judge Gilstrap construed the "authorization" terms to require compliance with a valid license. (Dkt.412-6 (Gilstrap Order) at 28 (construing "authorized," "unauthorized," and "authorization" as "compliant with a valid license," "not compliant with a valid license," and "a valid license").) As noted in Amazon's motion, PersonalWeb should have known it did not have a viable claim under these constructions because the conditional GET requests specified in the HTTP protocol have nothing to do with whether content is licensed. (*See* Mot. at 9.) PersonalWeb contends it was justified in ignoring Judge Gilstrap's constructions because an earlier order from Judge Davis determined that a *different* term—"license"—"require[d] no further construction." (Opp. at 6; Dkt. 412-7 ("Davis Order") at 26.) But Judge Davis's claim construction order should not have given PersonalWeb any confidence in its ability to prove that Amazon and its customers met the "authorization" limitations because (1) he did *not* construe the "authorization" terms that Judge Gilstrap later construed, and (2) he was resolving a separate dispute over "whether the license [of the patents] must be to the content of a file or to the system as a whole," which is not relevant to this case. (Davis Order at 25.) PersonalWeb argues in the alternative that it was not "clear" that its claims would fail under Judge Gilstrap's construction of the "authorization" terms. (Opp. at 6.) This argument is meritless.

### 1. PersonalWeb sought belated leave to amend its infringement contentions further after the Court rejected its arguments regarding the "authorization" terms.

First, after the *Markman* hearing, PersonalWeb asked for leave to amend its infringement contentions so that it could argue —incredibly—that the limitations requiring "authorization" were infringed when access to a website is governed by "Terms of Service or an End User License." (*See* Dkt. 452 at 6.) That argument, too, was frivolous. And while PersonalWeb argues that this was not done in anticipation of an adverse claim construction, its sudden need to amend its infringement contentions years into the case is otherwise unexplained.

### 2. Rather than dismiss its claims following claim construction, PersonalWeb told its expert to ignore the Court's constructions altogether.

Second, once the Court denied PersonalWeb leave to amend its infringement contentions and adopted Judge Gilstrap's construction of the "authorization" terms, PersonalWeb continued to plow ahead. But to do so, PersonalWeb was required simply to ignore the Court's adverse constructions. (*See* Mot. at 6, citing Dkt. 543-1 ¶¶ 64, 103.) Indeed, on the advice of counsel, PersonalWeb's expert Mr. de la Iglesia rewrote the Court's construction of "authorization" by inserting his interpretation of "license" into the Court's construction. (*See id.* at 6.) This position, too, was frivolous.

### 3. PersonalWeb sought reconsideration without leave by moving to "clarify" constructions that were clear and unambiguous.

PersonalWeb later filed a motion for "clarification" of the Court's claim construction order. (Dkt. 507.) Whether that motion was *procedurally* proper is highly debatable. Whether that motion lacked *substantive* merit is not. The Court made this clear at the hearing: "[T]here's nothing unclear about my ruling." (Dkt. 519 (Sept. 4, 2019 Hrg. Tr.) at 10:24-25.) Indeed, PersonalWeb's motion and arguments at the hearing left the Court "completely befuddled." (*Id.* at 16:11-14.) The Court summarily rejected PersonalWeb's request. (Dkt. 537.)

### IV. THE COURT SHOULD NEITHER CONSIDER NOR CREDIT PERSONALWEB'S OPINIONS OF COUNSEL.

As another example of PersonalWeb's exceptional approach to this litigation, PersonalWeb

chose to defend against Amazon's motion for attorneys' fees by attaching cherry-picked legal advice it received from counsel over the years leading up to its filing of 85 lawsuits. PersonalWeb has excerpted or had its attorneys characterize their advice and analysis regarding at least these subjects: (1) the claim constructions in its prior Texas cases (Opp. at 6; Bermeister Decl. at ¶ 3; Seth Decl. at ¶ 19); (2) PersonalWeb's motivations for dismissing the Texas Action and the advice it received regarding that dismissal (Bermeister Decl. at ¶¶ 3-4); (3) the effect of the Texas Action on the MDL cases, including purportedly "multiple prefiling legal opinions" regarding the strength of its position on claim and *Kessler* preclusion (Opp. at 3-4; Bermeister Decl. at ¶ 4; Monroe Decl. at ¶ 25; Sherman Decl. at ¶¶ 4, 6); (4) advice regarding settlement of litigation (Sherman Decl. ¶ 10); and (5) PersonalWeb's pre-filing investigation. But when Amazon notified PersonalWeb of its privilege waiver and requested production of all documents related to these subjects, PersonalWeb refused to produce most of them. (Gregorian Decl., Ex. 2 (June 30, 2020 Ltr to Sherman); *id.*, Ex. 4 (July 4, 2020 Ltr to Gregorian); *id.*, Ex. 5 (July 8, 2020 Ltr to Gersh).) PersonalWeb continues to withhold communications on these topics behind claims of attorney-client privilege and attorney work product. (*See* Dkt. 610 (Motion for Protective Order).) This, too, is frivolous.

Selective disclosures like PersonalWeb's—discussing privileged information that it views as advantageous, while at the same time withholding damaging information about the same subject—are profoundly unfair. That is why courts uniformly hold that "the privilege which protects attorney-client communications may not be used both as a sword and a shield," *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992) (citing *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991)), and order that "disclosing a privileged communication . . . results in waiver as to all other communications on the same subject," *Hernandez v. Tanninen*, 604 F.3d 1095, 1100 (9th Cir. 2010). *See also Nye v. Sage Prods., Inc.*, 98 F.R.D. 452, 453 (N.D. Ill. 1982) (production of a party's communications with former attorney waived the privilege for communications with current attorney relating to the same subject).

It is improper to consider evidence of attorney advice and work product in assessing reasonableness of litigation conduct when the offering party shields related evidence behind the privilege. *ThermoLife Int'l, LLC v. Myogenix Corp.*, No. 13cv651 JLS (MDD), 2017 WL 1235766, at

*3 (S.D. Cal. Apr. 4, 2017) (striking declaration submitted in opposition to attorney fee motion where the defendants "had no discovery regarding the[] recently added statements and arguments" and declaration "seem[ed] to selectively waive attorney-client privilege"); *ThermoLife Int'l LLC v. GNC Corp.*, 922 F.3d 1347, 1356 (Fed. Cir. 2019) (district court did not abuse its discretion in striking declaration because defendants "did not have an opportunity to conduct additional discovery in response to the facts and arguments raised in the declaration"). The Court should therefore disregard PersonalWeb's self-serving declarations about the legal opinions it received.

Even if the Court were to consider them, it should give them no weight. Nearly all of the declarants have an interest in the outcome of this litigation and this motion. Mr. Bermeister is an officer of PersonalWeb. (Bermeister Decl. ¶¶ 1, 6.) Wesley Monroe, Sandeep Seth, and Michael Sherman, counsel of record in this action, are attorneys with Stubbs Alderton & Markiles, LLP. (Monroe Decl. ¶ 1 (of counsel); Seth Decl. ¶ 1 (of counsel); Sherman Decl. ¶ 1 (partner).) Stubbs Alderton's venture arm, SAM Venture Partners, is a part-owner of PersonalWeb. (Case No. 5:18-cv-05619-BLF, Dkt. 3 (Notice of Interested Parties); Bermeister Dep. Tr. at 62:2-10; Gregorian Decl. Ex. 8 ("Stubbs Alderton created its first venture outfit in 2003, which was dubbed SAM Venture Partners. The fund was seeded with money from firm partners and offers legal services in exchange for equity in startup companies, according to the law firm's co-founder Scott Alderton.").) Mr. Seth is the principal of PatBak, the consulting firm that PersonalWeb hired to investigate potential infringement. (Seth Decl. ¶¶ 4, 6, 7, 22, 24.) The declarations are self-serving statements from a thicket of interested parties hoping to avoid the consequences of litigation abuse. They should be accorded no weight.

## V.  PERSONALWEB'S STRATEGY WAS CALCULATED SOLELY TO SECURE NUISANCE SETTLEMENTS RATHER THAN TEST THE MERITS OF ITS CLAIMS.

"[T]he repeated filing of patent infringement actions *for the sole purpose of forcing settlements*, with no intention of testing the merits of one's claims, is relevant to a district court's exceptional case determination under § 285." *ThermoLife*, 922 F.3d at 1363 (emphasis in original, quoting *SFA Sys., LLC v. Newegg Inc.*, 793 F.3d 1344, 1350 (Fed. Cir. 2015)). PersonalWeb contends that it never *pursued* "nuisance" settlements from the customers and in fact did not *agree* to any

FENWICK & WEST LLP
ATTORNEYS AT LAW

cost of litigation settlements in this case. (Opp. at 17-18, 23; Bermeister Decl. ¶ 12; Sherman Decl. ¶¶ 9-10.) The record does not support either contention. Instead, it reflects that PersonalWeb never set out to litigate its case on the merits.

First, on January 25, 2018, shortly after PersonalWeb filed its first round of cases against Amazon customers, its attorneys discussed a potential settlement with ▮▮▮▮. PersonalWeb's counsel Mr. Seth described PersonalWeb's strategy to settle quickly before the defendants formed a joint defense group to defend on the merits:

▮▮▮▮

(Gregorian Decl., Ex. 9).

Second, contrary to Mr. Bermeister's and Mr. Sherman's declaration testimony, PersonalWeb *has* entered numerous cost-of-litigation settlements concerning the asserted patents. PersonalWeb licensed the True Name patents to ▮▮▮ for ▮▮▮. (Gregorian Decl. Exs. 10-11 (correspondence between PersonalWeb and ▮▮▮.) PersonalWeb and Mr. Bermeister's previous company, Brilliant Digital, settled multiple lawsuits involving the True Name patents for between ▮▮▮▮ All of these are substantially less than the cost of defense of a typical patent litigation matter, which typically ranges between $300,000 and $2.5 million. (*Id.*, Ex. 12 (FTC PAE Study) at 4 n.7.) Naturally, this case has already cost far more.

PersonalWeb also offered to settle its claims against a defendant in this case ▮▮▮, a small company that ▮▮▮▮ Though ▮▮▮ ultimately did not agree to those terms, a ▮▮▮ settlement with a defendant that does not have the resources to defend a patent case is the very definition of a nuisance settlement.

Finally, PersonalWeb's lack of success in securing cost of litigation settlements may have been precisely because Amazon intervened in this case and secured a stay of the customer suits,

1  leaving those defendants with no incentive to settle.  Indeed, ▮▮▮▮, in rejecting PersonalWeb's
2  ▮▮▮▮ settlement offer stated that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
3  ▮▮▮▮  (*Id.*)  PersonalWeb should not get credit for any *revised* settlement strategy once Amazon
4  entered the case, particularly when that strategy forced Amazon to incur extraordinary expense in
5  defending its customers from harassment.

PersonalWeb's approach of filing lawsuits against a large number of defendants in order to secure nuisance settlements is precisely the kind of conduct courts have found to support an exceptional case determination.  Indeed, contrary to PersonalWeb's assertion, the facts of this case do strongly resemble those of *ThermoLife*, 2017 WL 1235766, at *6-7.  There, in addition to settling with multiple parties for small amounts, plaintiffs sold few if any products, asserted expired patents, and filed 85 lawsuits against diverse defendants.  *Id.* at *1, *7.  Here, as described above, PersonalWeb has a history of settling with multiple parties for relatively small amounts.  PersonalWeb engages in no business other than litigation. (Bermeister Tr. at 72:3-8.)  And PersonalWeb asserted its expired patents against more than 80 Amazon customers.  As the *ThermoLife* court found, such a pattern of conduct "weighs in favor of finding this case to be exceptional." *ThermoLife*, 2017 WL 1235766, at *7; *see also ThermoLife*, 922 F.3d at 1364 (affirming fee award, noting that even though small litigation settlements may not, without more, support a finding of exceptionality, the "pattern" of "irresponsible filing of infringement allegations" supported the district court's judgment, and a fee award "enhances the force of the deterrence policy" underlying Section 285).

## VI. PERSONALWEB WAIVED ANY CHALLENGE TO THE REASONABLENESS OF THE REQUESTED FEES AND COSTS.

As required by Rule 54, Amazon presented its evidence regarding the reasonableness of both the rates of its counsel at Fenwick & West LLP and the total fees and costs it incurred, including detailed billing records. (Mot. at 15-16; Dkt. 592-1 ¶¶ 2-22 & Exs. 1-6.)  Despite having three months to review this evidence, PersonalWeb did not raise any substantive challenge to the reasonableness of Amazon's requested fees and costs.  (*See* Opp. at 25.)  PersonalWeb was required to raise its arguments in its opposition, and by failing to do so it has waived any argument on this issue.  *See Earthquake Sound Corp. v. Bumper Indus.*, 352 F.3d 1210, 1215, 1219 (9th Cir. 2003)

(finding party "waived its challenge to the reasonableness of the award of attorney's fees" in trademark dispute by not objecting to either the reasonableness of the rates charged or number of hours worked, when prevailing party had submitted evidence as to their reasonableness); *Bd. of Trs. of Laborers Health and Welfare Trust Fund for N. Cal. v. RMT Landscape Contractors, Inc.*, No. 4:19-cv-01771-KAW, 2020 WL 978622, at *5 (N.D. Cal. Feb. 28, 2020) ("Defendant does not address the reasonableness of the billed hourly rates, and has, therefore, waived any arguments pertaining to their reasonableness.").

Given PersonalWeb's waiver, the Court would be well within its discretion to award Amazon its full fees. *See, e.g.*, *Goodell v. Ralphs Grocery Co.*, 207 F. Supp. 2d 1124, 1128-29 (E.D. Cal. 2002), *abrogated on other grounds by Hubbard v. Sobreck, LLC*, 554 F.3d 742, 745 (9th Cir. 2009). And that would be appropriate given that the fees were reasonably incurred and Amazon's request already reflects hundreds of thousands of dollars in voluntary reductions to ensure that reasonableness. Alternatively, the Court may exercise its discretion to conduct its own lodestar calculation. *Garcia v. Resurgent Capital Servs., L.P.*, No. C-11-1253 EMC, 2012 WL 3778852, at *7 (N.D. Cal. Aug. 30, 2012).

PersonalWeb seeks to defer a ruling on the reasonableness of fees until after the Court determines if this case is exceptional. (Opp. at 25.) While the *Court* in its discretion may consider fee entitlement and award amount separately, the Court did not order that here and PersonalWeb did not request it before applying it unilaterally in its opposition. Indeed, the Court held a hearing on PersonalWeb's request to defer consideration of the attorney fee motion until all appeals have been exhausted, a request first made only after PersonalWeb agreed to a briefing schedule and Amazon filed its opening brief. (Dkt. 604 (Apr. 16, 2020 Hrg. Tr.).) PersonalWeb never raised bifurcation of entitlement and amount of fees during that hearing or when it stipulated to extend the briefing schedule. (*See id.*) The Court should decline PersonalWeb's belated request for yet more delay.

PersonalWeb cites *Gilead Scis., Inc. v. Merck & Co., Inc.* for the notion that it is "impossible" to assess whether the requested fees are reasonable before the Court has determined whether fees should be awarded at all. (Opp. at 25 (citing *Gilead Scis., Inc. v. Merck & Co., Inc.*, No. 5:13-

FENWICK & WEST LLP
ATTORNEYS AT LAW

cv-04057-BLF, 2016 WL 4242216, at *1 (N.D. Cal. Aug. 11, 2016)).) PersonalWeb mischaracterizes the facts of that case. There, Merck argued that it could not assess the requested fees because Gilead provided no detailed billing records and only a two-page summary chart of the work done to incur over $14 million in fees. *Gilead v. Merck*, No. 5:13-cv-04057-BLF, Dkt. 444 at 6-8 (N.D. Cal. Jul. 19, 2016). The Court noted that because it uses "a very sharp scalpel" and closely analyzes hours for which parties seek fees, a "further breakdown" would be helpful in determining the amount of fees. *Id.*, Dkt. 456 at 28:2-36:8 (Aug. 4, 2016). Thus, the Court ordered separate briefing on the amount of fees. Here, unlike Merck, PersonalWeb has not asserted—nor could it assert—that it is unable to assess the reasonableness of the requested fees.

## VII.   CONCLUSION

For the reasons above and in its motion, Amazon and Twitch respectfully request that the Court award them the full amount of attorney fees and non-taxable costs that they incurred in defending this exceptional case.

Respectfully submitted,

Dated: July 23, 2020

FENWICK & WEST LLP

By: */s/J. David Hadden*
J. DAVID HADDEN (CSB No. 176148)

Counsel for AMAZON.COM, INC., AMAZON WEB SERVICES, INC., and TWITCH INTERACTIVE, INC.